UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Catherine Burke,
      Plaintiff

      v.                              Civil No. 08-cv-014-SM
                                      Opinion No. 2008 DNH 210
Amherst School District,
      Defendant

# O R D E R

Catherine Burke appeals the decision of a New Hampshire Department of Education ("DOE") Hearing Officer under provisions of the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. The Hearing Officer ruled that Burke's daughter, Sasha R., had not been denied a free appropriate public education ("FAPE") by the Amherst School District ("District"), notwithstanding the District's failure to implement the behavioral goal of Sasha's 2006-07 individualized educational program ("IEP") and the lack of a signed IEP for 2007-08 upon the expiration of Sasha's 2006-07 IEP. For the reasons given, Burke's requests for relief are denied, and the decision of the Hearing Officer is affirmed.

## Standard of Review

In its seminal IDEA opinion, the United States Supreme Court explained:

> [A] court's inquiry in suits brought under [20 U.S.C.]
> § 1415(e)(2) is twofold.  First, has the State complied
> with the procedures set forth in the Act.  And second,
> is the individualized educational program [IEP]
> developed through the Act's procedures reasonably
> calculated to enable the child to receive educational
> benefits?  If these requirements are met, the State has
> complied with the obligations imposed by Congress and
> the courts can require no more.

Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982) (footnotes

omitted).  "More recent decisions in this Circuit indicate that

the first part of this test is more instructive than dispositive

and that compliance with the second part is likely to nullify a

violation of the first part."  Sanford Sch. Comm. v. Mr. & Mrs.

L., No. 00-CV-113, 2001 WL 103544, at *6 (D. Me. Feb. 1, 2002)

(citing Town of Burlington v. Dep't of Educ., 736 F.2d 773, 788

(1st Cir. 1984)).


"When the district court reviews the administrative ruling

[in an IDEA case], it exercises its discretion, informed by the

record and by the expertise of the administrative agency and the

school officials, as to how much deference to afford the

administrative proceedings."  Sch. Union No. 37 v. Ms. C., 518

F.3d 31, 35 (1st Cir. 2008) (citing Lenn v. Portland Sch. Comm.,

998 F.2d 1083, 1087 (1st Cir. 1993); Hampton Sch. Dist. v.

Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992)).  "Judges are not

trained pedagogues, and they must accord deference to the state

agency's application of its specialized knowledge." Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008) (citing Renner v. Bd. of Educ., 185 F.3d 635, 641 (6th Cir. 1999)).  Accordingly, "judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Lessard, 518 F.3d at 24 (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)).

Regarding how, precisely, to negotiate the continuum between clear-error review and de novo review, the Court of Appeals for the Seventh Circuit has explained:

> On issues of law, the hearing officer is entitled to no deference. Dale M. ex rel. Alice M. v. Board of Educ., 237 F.3d 813, 817 (7th Cir. 2001). On issues of fact, however, the district court must accord "due weight" to the decision of the hearing officer. Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982). The rationale for this requirement is that, by mandating that district courts "receive the records of the [state] administrative proceedings," the statute implies that district courts must afford an appropriate level of deference — what the Supreme Court has styled as "due weight" — to those proceedings. Id.
>
> "Due weight" varies from case to case. At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." School Dist. v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002) (quotation omitted). This level of review is akin to the standards of clear error or substantial evidence. Id.

The more that the district court relies on new evidence, however, the less it should defer to the administrative decision: "[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have." Id. Thus, at the opposite extreme from cases in which the district court hears no new evidence, the administrative decision is relatively less important and the district court effectively acts as the factfinder. See MM ex rel. DM v. School Dist., 303 F.3d 523, 531 & n.12 (4th Cir. 2002). In such circumstances, although the administrative record is still part of the case and the district court therefore must not go so far as to conduct a trial de novo, see Monticello Sch. Dist. No. 25 v. George L., 102 F.3d 895, 901 (7th Cir. 1996), less weight is due the administrative record.

Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221, 375 F.3d 603, 611–12 (7th Cir. 2004) (parallel citations omitted).

"In the end, the judicial function at the trial-court level is one of involved oversight, and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Sch. Union 37, 518 F.3d at 35 (quoting Lenn, 998 F.2d at 1087).

As the party challenging the Hearing Officer's decision, Burke has the burden of proof. Sch. Union 37, 518 F.3d at 35 (citing Hampton Sch. Dist., 976 F.2d at 54). To carry that burden, she must do more than identify procedural irregularities because "procedural flaws do not automatically render an IEP

legally defective." Roland M., 910 F.2d at 994 (citing Doe v. Defendant I, 898 F.2d 1186, 1191 (6th Cir. 1990)). Rather, "[b]efore an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Roland M., 910 F.2d at 994 (citing Doe, 898 F.2d at 1191; Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 979, 982 (4th Cir. 1990); Burlington, 736 F.2d at 786).

## Background

At the times relevant to this action, Sasha R. was fourteen years old and suffered from fetal alcohol syndrome and reactive attachment disorder. She was identified under the IDEA as a student with special needs in the areas of "other health impairment" and "speech and language disability." During the 2005-06 school year, Sasha was a sixth-grader at RSEC Academy, a small private school that serves only educationally disabled students. While at RSEC, Sasha's education was directed by an IEP.

By March, 2006, Sasha's IEP team was working on her IEP for 2006-07, her seventh-grade year. At that time, Sasha's parents

were particularly interested in social programming.  Minutes of a
March 15 meeting state: "On behavioral area of focus and
pragmatic goal, Sasha's team will target behaviors as a
discussion point thru out the year based on the video taping and
social interaction progress."  On March 24, the District proposed
an IEP for Sasha and sent her parents a parental response form.
They signed the form, indicating that they agreed with the
proposed IEP and placement "with exceptions."  Specifically,
Sasha's parents agreed with the goals and objectives in the IEP,
but took exception to Sasha's continued placement at RSEC
Academy, because that school did not provide adequate
opportunities for inclusion, i.e., education with non-disabled
peers.

Sasha's 2006-07 IEP characterizes her "current performance
level" in the behavioral area of focus as follows:

> Sasha is enthusiastic and friendly.  She is gaining
> awareness of some of her actions that lead to reactions
> in others.  Currently she is about 75% self directed in
> maintaining attention and monitoring her level of
> maturity when she is in familiar settings.  She needs
> occasional reminders about personal space and age
> appropriate level of interaction with her peers.  The
> longer the activity the more likely she will need a
> reminder or redirection.  However, initiating
> activities is the most challenging for in choosing the
> level of maturity appropriate for the activity.  On her
> daily checklists she is meeting her goals most days.
> This is a significant improvement over last year.  She
> has made strides in recognizing the appropriate
> manipulative to focus her attention rather than

distract.  Participating in activities such as the
school store have been good and positive learning
opportunities for Sasha's social development.
Interacting with peers and older students often affords
teachable moments presented by her social miscues.
Sasha has great difficulty with executive function
skills which hinders her with transferring newly
acquired practiced learning to new and novel
situations.  This requires on going direct instruction
in the application of social skills across multiple
environments.  Continued refinement of her social
pragmatic skills will be necessary for her to progress
in the general curriculum.

(Administrative Record ("AR"), Vol. IV, at 478.)  Sasha's 2006-07

IEP included one "measurable annual goal" in the behavioral area

of focus: "Pragmatics: To increase Sasha's ability to

appropriately interact with peers and adults in a one on one

setting across various learning and social environments, and to

recognize her own behavior as measured by weekly goal sheets."

(Id.)  Sasha's progress toward meeting the goal was to be

measured by means of "[t]eacher observation and [an] informal

checklist/feedback questionnaire."  (Id.)  The behavioral goal

was supported by three benchmarks or short-term objectives:

1. Given videotaped sessions of group and social
interactions, Sasha will view the videotape and reflect
on her behavior during the session with teacher
guidance at 85% accuracy and independently with 75%
accuracy.

2. Given group and social interaction, Sasha will
recognize inappropriate targeted behaviors and self
correct, self regulate, applying what she has learned,
relative to the targeted behaviors, to familiar and
novel social interactions with teacher guidance [at]

85% accuracy and independently [at] 75% percent
accuracy.

3. Sasha wil[l] demonstrate targeted behavior learning
to new and novel situations with cuing 4 out of 5
trials and 2 out [of] 5 trials independently.

(Id.)

Sasha's 2006-07 IEP included a total of eight goals (three
in reading, two in speech/language, and one each in reading study
skills, math, and behavior.  Those eight goals were supported by
approximately 100 separate short-term objectives.

On August 24, 2006, the District proposed to place Sasha at
RSEC Academy for the 2006-07 school year.  Sasha's parents
rejected the proposal.  The District requested an administrative
due process hearing.  A resolution session ensued.  At a
subsequent IEP team meeting, the District proposed an amendment
to the previously proposed IEP.  The amendment provided, in
pertinent part: "1. Sasha will be educated at AMS [Amherst Middle
School] 25 hours/week until the end of 1st Trimester (after
T.giving)  2. She will be educated in public school setting [and]
3. Dr Afshar [a psychologist hired by the District to consult
with the IEP team] will consult w/ team 1x mth."  The amendment
did not alter Sasha's behavioral goal or any of the three
associated objectives.  Sasha's parents signed the amendment.

Shortly thereafter, Sasha's case manager began seeking her parents' consent to further amend the IEP by deleting the first objective in the behavioral area of focus, the one related to videotaping, and replacing it with a positive behavior support plan.  The District sought such a change due to various concerns over videotaping in a public school setting.  Sasha's case manager and her parents discussed the change throughout September, October, and November, but Sasha's parents never agreed to delete the videotaping objective.  The videotaping was never done, and the District did not maintain the weekly goal sheets called for under the behavioral goal in the 2006-07 IEP. On the other hand, in November, 2006, Sasha was reported to have made limited progress toward the second objective under her behavioral goal; in February, 2007, she was reported to have made satisfactory progress toward the second objective and limited progress toward the third objective; and in June, 2007, she was reported to have made satisfactory progress toward both the second and third objectives.  (AR, Vol. IV, at 69.)  Sasha's 2006-07 IEP expired on April 4, 2007.  There was no agreed-upon successor IEP in place at that time, but after April 4, the District continued to provide Sasha the same services it had provided before the 2006-07 IEP expired.

On March 9, 2007, Sasha's IEP team, including plaintiff, held a meeting to discuss Sasha's IEP for the 2007-08 school year.  The team met again on March 30 to review a proposed IEP, but was unable to finalize it, and scheduled another meeting for April 12.  On April 10, the District's Director of Special Services wrote to plaintiff and explained that with the expiration of Sasha's 2006-07 IEP, it was necessary for the District "either . . . to extend the current document to a date certain or offer [plaintiff] the proposed IEP in its current condition for [her] to accept, reject, or accept with exceptions."  Plaintiff responded:

> I do not wish to be confrontational about this matter, but the fact that Sasha has now been left without an IEP is a situation that was created by the district and a situation for which neither Sasha nor her parents bear any responsibility.  The IEP in its current form is a draft that was read to the team by Nicole and Bonnie.  It is unclear to me who actually wrote it.  However, to date there has been no opportunity for discussion or development of that document by the team (i.e. there was no opportunity to change the document presented to reflect suggestions and comments made by members of the team).  Consequently that IEP does not comply with the requirements for FAPE and I would, of course, reject it.  I have already declined to extend the old IEP, because I see no reason why it should be kept in place for over a year.  That would also deny FAPE.  Serious flaws in that IEP have been known to the team since the start of the school year.  That IEP was never revised to address those flaws.  It makes no sense to me to extend an IEP that is already known to be inadequate.

> The expiration date of Sasha's IEP was clear and it was the district's responsibility to see to it that a new IEP was properly developed and offered in time.

> That didn't happen and the simple fact of the matter is
> that it is now just plain too late to provide Sasha
> with an IEP that meets the requirements of IDEA in a
> timely manner.

The IEP team met again on April 12, but could not finalize an

IEP.  The team scheduled another meeting, and plaintiff declined

to give her written consent an amendment that would have extended

Sasha's 2006-07 until May 30.


As of June, 2007, Sasha's progress toward meeting six of her

eight IEP goals (supported by approximately seventy objectives)

had been assessed three times (in November, February, and June of

the 2006-07 school year), and her progress toward the other two

goals (supported by approximately thirty objectives) had been

assessed twice (in November and February).  According to the most

recent evaluations in the administrative record, Sasha had

achieved or made satisfactory progress toward more than sixty-

five of the objectives listed in her IEP, and had made some

progress toward nearly eighty-five of them.  (AR, Vol. IV, at 58-

81.)  Fewer than fifteen were listed as "not started" or "not

worked on this trimester."  (Id.)  Moreover, as noted above,

notwithstanding the District's failure to implement the

videotaping objective under Sasha's behavioral goal, from

November, 2006, to June, 2007, Sasha progressed from "limited

progress" to "satisfactory progress" on the second behavioral

objective and from "not started" to "satisfactory progress" on the third behavioral objective.  (AR, Vol. IV, at 69.)

The administrative record also includes three narrative reports on Sasha's progress during her seventh-grade year, each of which was positive.  Speech-language pathologist Bonnie Richardson reported:

> During this time frame, Sasha received an hour and a half of individual speech-language services.  Therapy focused on Sasha's social-pragmatic language skills. Areas covered included: maintaining eye contact, demonstrating appropriate physical space between herself and her communication partner, how to enter a room appropriately, using an appropriate tone of voice for the conversation, adding relevant information when maintaining a conversation.  With cues, Sasha continues to show progress on the above areas listed.

(AR, Vol. IV, at 87).  Language arts teacher Carolyn Bowman reported:

> Sasha has made evident, steady progress in all strands of language arts this year.  Her end of the year post tests each revealed growth and proficiency.  Without assistance, Sasha scored an 81% on her vocabulary final.  When read to her, she scored an 87% on the Language Arts Final, and with minimum teacher cuing, she scored an 80% on her Parts of Speech Final.  Sasha has also demonstrated a stronger willingness to follow the steps involved in the writing process which enabled her to publish a self composed poem in our 2007 Literary Magazine.  Sasha's positive energy and attitude have brought her a long way this year in my class; I enjoyed teaching her and am proud of her progress.

(<u>Id.</u> at 88.)  Finally, reading specialist Mary Westwater
reported:

> Sasha [R.] came to the Amherst Middle School in the
> fall of 2006 from RSEC Academy where she was in a
> language based academic program and intensive reading
> remediation that included daily Wilson Reading.  Wilson
> is a reading program in which the instructor leads the
> students through a systematic acquisition of skills
> based on the complex structure of sounds and
> connections among sets of sounds.  Due to the fact that
> Sasha's degree of word attack skill acquisition was
> well integrated into her reading, it was decided that
> she would not continue in the Wilson program at AMS and
> instead attend my classes whose content emphasizes
> comprehension and the review of syllabication patterns
> in an opportunistic way – when necessary for the
> understanding of the group.  Sasha has done quite well
> in this setting.  She is an energetic participant in
> discussions.  Her responses are insightful and often
> her eagerness to find out "what happens" in a story
> leads her to read ahead in her spare time.  Away from
> the school setting, Sasha enjoys reading for pleasure
> as well.  Sasha's fluency and comprehension have
> improved this year along with her speed and accuracy.
> I am comfortable with her rate of skills acquisition
> and look forward to working with her in the fall of
> 2007 as we further enhance her skills.

(Id.)


On May 3, plaintiff submitted a due-process hearing request
to the New Hampshire Department of Education.  Resolution
sessions were held on May 16 and 23.  On May 30, the District
presented plaintiff with an IEP proposal, which plaintiff
rejected.  Plaintiff rejected subsequent IEP proposals on June 15

and July 10.  The DOE conducted a two-day hearing on July 30 and
August 6.

The DOE Hearing Officer ruled in favor of the District.
More specifically, she determined that a positive behavior
support plan that the District substituted for the videotaping
objective more than satisfied the IDEA, as interpreted by <u>Rowley</u>.
(AR, Vol. I, Tab 1, at 5-6.)  The Hearing Officer also determined
that "[t]he greater part of the blame for delay in producing a
completed IEP [for 2007-08] cannot be placed with the School
District" (<u>id.</u> at 6), and that "[p]rocedural errors by the School
District did not materially affect the IEP process" (<u>id.</u>).
Rather, the Hearing Officer identified Sasha's parents as the
primary cause of the delay in completing the 2007-08 IEP.  (<u>Id.</u>)
Thus, the Hearing Officer concluded:

> Reviewing the testimony and the documentary evidence
> presented in this matter, it is concluded that the Parents
> have not met their burden of showing that the School
> District has denied Student FAPE for failing to implement
> the behavioral goal in Student's 2006-2007 IEP and for
> failing to have in place a complete and properly developed
> IEP at expiration of her most recent IEP.

(<u>Id.</u> at 7.)

This suit followed.  In it, plaintiff asks the court to find
that Sasha was denied a FAPE during the 2006-07 school year and

from April, 2007 (when her 2006-07 IEP expired), until November
2007 (when a complete IEP was offered).  By way of relief,
plaintiff seeks the compensatory education she requested for
Sasha at the due-process hearing, as well as any other
compensatory educational services that may be necessary to remedy
Sasha's losses.

## Discussion

Plaintiff argues that the Hearing Officer's finding that
Sasha was not denied a FAPE was foreclosed by her findings that:
(1) the behavioral goal in Sasha's 2006-07 IEP was not
implemented; (2) no reflections on videotaped sessions ever
occurred; (3) no weekly goal sheets were kept to measure progress
as called for under the IEP's behavioral goal; and (4) the
District did not offer Sasha an IEP for 2007-08 that contained
all the required components prior to the expiration of her 2006-
07 IEP.  In plaintiff's view, those findings necessitated a
finding that Sasha was denied a FAPE from April, 2006, when the
2006-07 IEP went into effect, through November, 2007, when the
successor IEP went into effect.  The District counters that
plaintiff has failed to carry her burden of proving, by a
preponderance of the evidence, that Sasha was denied the
opportunity to receive meaningful educational benefits.  The
court agrees.

15

Under the IDEA, "as a condition for receiving federal funds, states must provide all disabled children with a FAPE." Lessard, 518 F.3d at 23 (citing 20 U.S.C. §§ 1401(8), 1412(a)(1)(A)). The primary vehicle for delivering a FAPE is a child's IEP. See id. At a minimum, an IEP must include "the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." Id. (citing 20 U.S.C. § 1414(d)(1)(A); Lenn, 998 F.2d at 1086).

"An IEP is subject to both procedural and substantive requirements." Lessard, 518 F.3d at 23. "Those requirements can flow from either federal or state law." Id. (citing Roland M., 910 F.2d at 987). "Federal and state law converge in demanding that an IEP be in effect by the commencement of the school year." Lessard, 518 F.3d at 23 (citing 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.342(a) (2000); N.H. CODE ADMIN. R. ANN. ED. 1109.08(c) (2007)).

"There is no mechanical checklist by which an inquiring court can determine the proper content of an IEP; 'IEPs are by their very nature idiosyncratic.'" Lessard, 518 F.3d at 23 (quoting Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d

9, 20 (1st Cir. 2003)).[1]  "One thing is clear: the substance of
an IEP must be something different than the normal school
curriculum and something more than a generic, one-size-fits-all
program for children with special needs."  Lessard, 518 F.3d at
23.  As the Supreme Court has explained, "an IEP must be
'individually designed to provide educational benefit to [a
particular] handicapped child.'"  Id. (quoting Rowley, 458 U.S.
at 201).  However, "the obligation to devise a custom-tailored
IEP does not imply that a disabled child is entitled to the
maximum educational benefit possible."  Lessard, 518 F.3d at 23
(citing Rowley, 458 U.S. at 206-08; C.G. ex rel. A.S. v. Five
Town Cmty. Sch. Dist., 513 F.3d 279, 284-85 (1st Cir. 2008); Lt.
T.B. ex rel. T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st
Cir. 2004).  "An IEP need only supply 'some educational benefit,'
not an optimal or an ideal level of educational benefit, in order
to survive judicial scrutiny."  Lessard, 518 F.3d at 23-24
(citing Mr. & Mrs. R., 321 F.3d at 11; Roland M., 910 F.2d at
992).[2]

_____

[1] Lessard also seems to suggest that Sasha's IEP may not
have needed a behavioral component in order to comply with the
IDEA.  518 F.3d at 25-26 (citing 20 U.S.C. §§ 1415(k)(1)(A) &
(B); Alex R., 375 F.3d at 614.  But, because defendant does not
raise that issue, the court declines to address it.

[2] Several circuits appear to have adopted a higher standard
than "some educational benefit."  See, e.g., N.B. ex rel. C.B. v.
Hellgate Elem. Sch. Dist., 541 F.3d 1202, 1212-13 (9th Cir. 2008)
("Under the 1997 amendments to the IDEA, a school must provide a
student with a 'meaningful benefit' in order to satisfy the

"Serial review mechanisms present the means for enforcing these procedural and substantive rights." Lessard, 518 F.3d at 24. "By statute, parents may file a complaint with the state educational agency, which must convene a hearing (sometimes called a 'due process hearing') to pass upon the adequacy of a proposed IEP." Id. (citing 20 U.S.C. § 1415(f)). "Either side may then appeal from the hearing officer's final decision to either a federal or state court of competent jurisdiction." Id. (citing 20 U.S.C. § 1415(i)(2)(A)). A reviewing court, in turn, must "base[ ] its decision on the preponderance of the evidence .

substantive requirements of the IDEA.") (citing Adams ex rel. Adams v. Oregon, 195 F.3d 1141, 1145 (9th Cir. 1999)); Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004) ("[W]e agree that the IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue."). While the Ninth Circuit regards "meaningful education benefit" to be a higher standard than "some educational benefit," see Hellegate Sch. Dist., 541 F.3d at 1213, the Third Circuit appears to regard the two standards as identical:

> They [the parents] contend that the ALJ incorrectly found that an IEP need only provide "some educational benefit." . . . We see no error; indeed, the same language – "some educational benefit" – is found in our Kingwood Township decision. That decision clearly confirmed that "some educational benefit" requires provision of a "meaningful educational benefit," 205 F.3d at 577, the standard the ALJ clearly and accurately outlined earlier in her opinion.

L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 395 (3d Cir. 2006) (citing T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572 (3d Cir. 2000)). In any event, in this circuit, the "some educational benefit" standard applies. See Lessard, 518 F.3d at 22–23.

. . [and] grant such relief as [it] determines is appropriate."
20 U.S.C. § 1415(i)(2)(C)(iii).

As noted, this case presents two basic questions: whether
the Hearing Officer erred by finding that Sasha was not denied a
FAPE during the 2006-07 school year and whether the Hearing
Officer erred by finding that Sasha was not denied a FAPE during
the seven months after her 2006-07 IEP expired.

1.  Implementation of the 2006-07 IEP

The court of appeals for this circuit appears not to have
addressed the question of just how far a school district may
deviate from the terms of an IEP before it fails to provide a
FAPE.  Several other circuits, however, have confronted that
issue.  See, e.g., Van Duyn ex rel. Van Duyn v. Baker Sch. Dist.,
502 F.3d 811 (9th Cir. 2007); Neosho R-V Sch. Dist. v. Clark, 315
F.3d 1022 (8th Cir. 2003); Houston Indep. Sch. Dist. v. Bobby R.,
200 F.3d 341 (5th Cir. 2000).  The Ninth Circuit's discussion of
the appropriate standard for evaluating the implementation of an
IEP provides useful guidance:

> As noted earlier, the Supreme Court in Rowley was
> faced with a challenge to an IEP's content.
> Nevertheless, the Court's approach is instructive in
> the IEP implementation context as well.  In particular,
> it is significant that, according to the Court,
> procedural flaws in an IEP's formulation do not
> automatically violate the IDEA, but rather do so only

19

when the resulting IEP is not "reasonably calculated to
enable the child to receive educational benefits."  458
U.S. at 207.  This suggests that minor failures in
implementing an IEP, just like minor failures in
following the IDEA's procedural requirements, should
not automatically be treated as violations of the
statute.  The Court's description of the IDEA's purpose
as providing a "basic floor of opportunity" to disabled
students rather than a "potential-maximizing education"
also supports granting some flexibility to school
districts charged with implementing IEPs.  Id. at 197
n.21.

     The two circuits to have explicitly addressed IEP
implementation failures both did so in a manner
consistent with our reading of the statutory text and
Rowley.  In Bobby R., the Fifth Circuit considered a
disabled child whose IEP had not been perfectly
implemented and whose academic performance had improved
in some areas and declined in others.  The court held
that "to prevail on a claim under the IDEA, a party
challenging the implementation of an IEP must show more
than a de minimis failure to implement all elements of
that IEP, and, instead, must demonstrate that the
school board or other authorities failed to implement
substantial or significant provisions of the IEP."  200
F.3d at 349.  Employing this standard, the court
concluded that conceded implementation failures did not
violate the IDEA because "the significant provisions of
[the child's] IEP were followed, and, as a result, he
received an educational benefit."  Id.

     Similarly, the Eighth Circuit held in Clark that
the IDEA is violated "if there is evidence that the
school actually failed to implement an essential
element of the IEP that was necessary for the child to
receive an educational benefit."  315 F.3d at 1027 n.3.
To determine if the "fact that no cohesive plan was in
place to meet [the child's] behavioral needs" gave rise
to a statutory violation, the court considered both the
shortfall in services provided and evidence regarding
the child's progress in several areas.  Id. at 1029.
The court concluded that the IDEA was indeed violated
because the actions taken by the school "did not
appropriately address [the child's] behavior problem,"
id. at 1028, and "any slight benefit obtained was lost
due to behavior problems that went unchecked and

interfered with [the child's] ability to obtain a
benefit from his education."  Id.

In accordance with the IDEA itself, the Court's
decision in Rowley and the decisions of our sister
circuits, we hold that a material failure to implement
an IEP violates the IDEA.  A material failure occurs
when there is more than a minor discrepancy between the
services a school provides to a disabled child and the
services required by the child's IEP.  Because the
parties debate whether Van Duyn's skills and behavior
improved or deteriorated during the 2001-02 school
year, we clarify that the materiality standard does not
require that the child suffer demonstrable educational
harm in order to prevail.  However, the child's
educational progress, or lack of it, may be probative
of whether there has been more than a minor shortfall
in the services provided.  For instance, if the child
is not provided the reading instruction called for and
there is a shortfall in the child's reading
achievement, that would certainly tend to show that the
failure to implement the IEP was material.  On the
other hand, if the child performed at or above the
anticipated level, that would tend to show that the
shortfall in instruction was not material.

Van Duyn, 502 F.3d at 821-22 (footnote and parallel citations

omitted).


In Van Duyn, the court of appeals affirmed the trial court's

ruling that the administrative law judge correctly decided that

the school district was liable for a "material implementation

failure" when it undershot, by five hours, the IEP requirement of

eight to ten hours of math instruction per week.  Id. at 823.  On

the other hand, the court held that the school district was not

liable for a material implementation failure in the area of

behavior management, notwithstanding the following:

21

> Van Duyn is correct that several elements of his
> behavior management plan were not implemented in the
> same way at the middle school as at the elementary
> school.  The daily behavior card was not used as
> strictly as it was before.  Social stories were never
> employed in Ms. Walker's three classes and were
> improperly used by Ms. Baxter and Ms. Irby.  And Van
> Duyn was not told to go to the "quiet room" after all
> incidents of misbehavior, nor was the room adequately
> equipped until just before the administrative hearing.

Id. at 823-24.  In ruling that those deviations did not amount to

a material implementation failure, the court noted, among other

things, that there was "evidence that the elementary school

behavior management plan was inappropriate for the middle school

context."  Id. at 824.


In Clark, the court of appeals described the following

circumstance as an implementation failure:  "the IEPs required a

behavior management plan and . . . the attachments to the IEPs

did not qualify as such and no approved plan was timely

developed."  315 F.3d at 1027; see also id. at 1027 n.3.[3]  In

_____

[3] While the Van Duyn court characterized Clark as a case
about failure to implement an IEP, Clark is not quite so
straightforward as that:

> This case is slightly different in posture from
> others we have seen because it involves a failure to
> implement a necessary provision of an otherwise
> appropriate IEP.  See Houston Ind. Sch. Dist. v. Bobby
> R., 200 F.3d 341, 349 (5th Cir. 2000) (setting forth
> the analysis that a party who is challenging the
> implementation of an IEP must demonstrate that the
> school authorities failed to implement a substantial or

22

determining that the foregoing implementation failure was
material, and constituted the denial of a FAPE, the court had
before it evidence of Robert Clark's ongoing and escalating
behavioral problems:

> As the 1997-98 school year progressed, Robert's
> behavior problems increased dramatically.  His
> challenging behaviors numbered 3 in the month of
> August, 10 in the month of September, and 394 by March.
> . . .  Robert's increasingly inappropriate behavior
> prevented him from being included in mainstreamed
> classes beyond music and substantially interfered with
> his ability to learn.

Id. at 1025.  In addition, by the time the Clark case reached the
court of appeals, the district court had accepted the state
administrative hearing panel's determination that Robert had

---

> significant provision of the IEP; and noting that this
> analysis affords schools some flexibility in
> implementing IEPs but still holds them accountable for
> material failures and for providing a meaningful
> educational benefit) . . . .  While the analysis set
> forth in Bobby R. more accurately suits the posture of
> this case, the parties did not make this argument.
> Thus, we confine our analysis to the framework of
> Rowley, which considers whether the IEP was reasonably
> calculated to provide an educational benefit.  We
> believe that this analysis is pliable enough to fit the
> situation at hand and will safeguard the same
> principles because we cannot conclude that an IEP is
> reasonably calculated to provide a free appropriate
> public education if there is evidence that the school
> actually failed to implement an essential element of
> the IEP that was necessary for the child to receive an
> educational benefit.

Clark, 315 F.3d at 1027 n.3.

received no educational benefit during the 1997-98 school year.
Id. at 1028.

In Bobby R., the Texas Education Agency ("TEA") hearing
officer determined that the IEP at issue was "reasonable and
calculated to provide . . . an educational benefit."  200 F.3d at
344.  However, the hearing officer also "found that [the school
district] had failed to implement, 'consistently or
appropriately,' an [Alphabetic Phonics] program, IEP
modifications, or speech therapy," id., and "thus concluded that
[the school district]'s failures in [those] areas had deprived
[Bobby R.'s son] Caius of a free appropriate public education
under the IDEA," id. (internal quotation marks omitted).  For its
part, the district court "held that the TEA had erred in its
analysis of whether Caius had indeed received a free appropriate
public education . . ., reason[ing] that he had shown improvement
in most areas of study and therefore had received an educational
benefit in accordance with the goals of the IDEA."  Id. at 345
(internal quotation marks omitted).  The court of appeals
affirmed.

Turning to the case at bar, the court is persuaded by Van
Duyn and Bobby R. that the Hearing Officer's findings concerning
the implementation of Sasha's IEP did not require her, as a

24

matter of law, to determine that Sasha had been denied a FAPE.
That is, even a demonstrated IEP implementation failure, without
more, does not constitute a <u>per</u> <u>se</u> denial of a FAPE or a <u>per</u> <u>se</u>
violation of the IDEA.  Rather, it was within the Hearing
Officer's discretion to decide whether the District was liable
for a <u>material</u> implementation failure as opposed to an
implementation failure that did not rise to the level of denying
Sasha a FAPE.  Given the standard of review in IDEA cases, <u>see</u>
<u>Lessard</u>, 518 F.3d at 24; <u>Sch. Union 37</u>, 518 F.3d at 35, and the
evidence in the record that Sasha's IEP, as implemented, provided
her with more than just "some educational benefit," <u>see</u> <u>Lessard</u>,
518 F.3d at 23-24, plaintiff has failed to carry her burden of
proving that the District's failure to provide the videotaping
called for in Sasha's IEP denied her a FAPE.  See <u>Van Duyn</u>, 502
F.3d at 823 n.5 ("He did not work toward all of the short-term
objectives laid out in his IEP, but this failure was not material
given the extremely large number of such objectives.").


    In terms of the relevant, albeit not controlling, decisional
law, the facts of this case make it less similar to <u>Clark</u> than to
<u>Bobby R.</u>


    In contrast to the situation in <u>Clark</u>, where Robert Clark
exhibited a dramatic increase in challenging behaviors, <u>see</u> 315

F.3d at 1025, Sasha's behavioral issues appear to have been largely in check, due in no small measure to IEP-driven monitoring by her teachers and the provision of services, such as the "lunch bunch" group, beyond those called for by the IEP. Moreover, the failure to implement the videotaping objective in Sasha's IEP is not analogous to the material implementation failure in Van Duyn, which consisted of a five-hour per week shortfall in the requirement of eight to ten hours per week of math instruction.  See 502 F.3d at 823.  While there are multiple ways to achieve Sasha's behavioral goal, videotaping being one of three identified in the IEP, Christopher Van Duyn's math goal required math instruction.

On the other hand, here, as in Bobby R., 200 F.3d at 349, the record demonstrates academic achievement.  Across the eight areas of focus in her IEP, Sasha achieved or made satisfactory progress toward more than sixty-five objectives, and made at least some progress toward nearly eighty-five of them.  Thus, like the court in Bobby R., this court "cannot say that the [Hearing Officer] committed 'clear error' in [her] factual determination that [Sasha] received an educational benefit from [her] IEP."  Id. at 350 (citing Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 252 (5th Cir. 1997)); see also Rowley, 458 U.S. at 203 (identifying academic achievement  as "an

important factor in determining educational benefit").  Even under a less deferential standard of review than "clear error," the court can discern no error on the part of the Hearing Officer that would warrant a contrary finding.  And, as in <u>Van Duyn</u>, there is evidence that school officials deviated from the IEP at least in part as a result of the change in schools urged by the parents — what was feasible in the prior school was less so in the new public school.  <u>See</u> 502 F.3d at 824.  Here, the videotaping objective was developed for use in the small private school from which Sasha was transferred, at her parents' insistence.

In sum, after exercising discretion, <u>see</u> <u>Sch. Union 37</u>, 518 F.3d at 35, and engaging in "involved oversight," <u>see</u> <u>id.</u>, the court is satisfied that the District's failure to implement the videotaping objective did not deprive Sasha of a FAPE.

### 2.  Lack of an IEP from April through November, 2007

Plaintiff argues that Sasha was denied a FAPE from April through November, 2007, because her 2006-07 IEP expired in April and its successor was not agreed to until November.

While the IDEA requires schools to provide special needs students with a FAPE, and the primary vehicle for delivering a

FAPE is an IEP, the lack of a signed IEP does not constitute a per se denial of a FAPE.  See Lessard, 518 F.3d at 26-27. Plaintiff's argument might have merit if Sasha's educational services had been terminated upon the expiration of her 2006-07 IEP, but those services continued unabated.  Because the District continued to provide identical services from April 4 onward, Sasha could have been denied a FAPE after April 4 only if the services she received before that date were insufficient to provide her with a FAPE.[4]  But that argument has already been rejected; the District's deviations from Sasha's 2006-07 IEP did not deprive Sasha of a FAPE.  The bottom line is this: Sasha received a FAPE under her 2006-07 IEP, as implemented, both before its expiration on April 4, and from April 4 until the time her successor IEP was approved.

To be sure, the record documents various procedural irregularities in the District's dealings with Sasha's parents, to which the District freely admits.  But procedural irregularities amount to IDEA violations only when they "compromise[ ] the pupil's right to an appropriate education, seriously hamper[ ] the parents' opportunity to participate in the formulation process, or cause[ ] a deprivation of educational

---

[4] Plaintiff has given the court no reason to conclude that the constellation of services that provided a FAPE up until April 4 failed to do so after that date.

benefits." <u>Roland M.</u>, 910 F.2d at 994.  Here, Sasha received a
FAPE at all relevant times and, as the record demonstrates, her
parents' opportunity to participate in the formation of her IEP
has not been seriously hampered.  To the contrary, Sasha's
parents appear to have participated extensively and productively
in the process of forming Sasha's IEP.

Plaintiff insists that the District bears full
responsibility for the time between the expiration of Sasha's
2006–07 IEP and finalization of its successor.  But the
authorities upon which plaintiff relies are not supportive.
First, unlike the student in <u>Murphy v. Timberlane Regional School
District</u>, 22 F.3d 1186 (1st Cir. 1994), who received no services
at all during the two years it took the parents and school
district to arrive at a suitable IEP, Sasha received services
continuously from the time her 2006–07 IEP expired until its
successor was in place.  Moreover, the inaction for which the
school district was faulted in <u>Murphy</u> was not failure to have an
IEP in place by a particular date, but rather, the school
district's failure to request a due-process hearing to resolve
its stalemate with the parents.  Here, Sasha's parents requested
a due-process hearing less than a month after her 2006–07 IEP
expired.  Second, unlike the student in <u>Mr. & Mrs. R.</u>, who was
provided inadequate services pending the formulation of an IEP,

29

<u>see</u> 321 F.3d at 9, Sasha was provided with a FAPE at all times relevant to this matter.

Because Sasha received the same services after April 4, 2007, that she received before that date, and because those services provided her with educational benefits, the court is satisfied, as determined by the Hearing Officer, that the lack of an agreed-upon IEP between April and November, 2007, did not deprive Sasha of a FAPE.

## Conclusion

For the reasons given, plaintiff's requests for relief are denied.  The September 6, 2007, decision of the Hearing Officer is affirmed.  The clerk of court shall enter judgment in favor of defendant and close the case.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

December 18, 2008

cc:  Catherine E. Burke, <u>pro</u> <u>se</u>
     Paul L. Apple, Esq.

30